# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 14-710


**STATE OF LOUISIANA**

**VERSUS**

**JAMES CRAIG JOHNSON, JR.**


**\*\*\*\*\*\*\*\*\***


## APPEAL FROM THE
## NINTH JUDICIAL DISTRICT COURT
## PARISH OF RAPIDES, DOCKET NO. 309,717
## HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\***


## JAMES T. GENOVESE
## JUDGE


**\*\*\*\*\*\*\*\*\***


Court composed of John D. Saunders, Jimmie C. Peters, and James T. Genovese, Judges.


**AFFIRMED.**

**Brent Hawkins**
**Louisiana Appellate Project**
**Post Office Box 3752**
**Lake Charles, Louisiana  70602-3752**
**(337) 502-5146**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       James Craig Johnson, Jr.


**James C. "Jam" Downs**
**District Attorney—Ninth Judicial District**
**Monique Y. Metoyer**
**Assistant District Attorney**
**Post Office Drawer 1472**
**Alexandria, Louisiana  71309**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
       State of Louisiana

**GENOVESE, Judge.**

In this criminal case, Defendant, James Craig Johnson, Jr., appeals his second degree murder conviction, alleging insufficiency of the evidence and the impermissible withholding of *Brady*[1] material and exculpatory evidence. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

The facts in the record reveal that on the afternoon of January 4, 2012, the body of the victim, Ms. Jacqueline Bazert, was discovered in her home at 222 Fifteenth Street, Alexandria, Louisiana. Ms. Bazert had been stabbed 137 times and died as a result of those stab wounds.

On November 13, 2013, a Rapides Parish jury found Defendant guilty of the second degree murder of Ms. Bazert, a violation of La.R.S. 14:30.1. Defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. Defendant filed a Motion for Reconsideration of Sentence, which was denied.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. Our review of the record does not establish any errors patent.

## ASSIGNMENTS OF ERROR

Defendant has submitted for our review the following two assignments of error:

> ASSIGNMENT OF ERROR NO. 1: The evidence presented at trial was insufficient to convict the Appellant of second-degree murder.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

ASSIGNMENT OF ERROR NO. 2:  The State committed reversible error by failing to disclose facts favorable to Appellant in violation of *Brady*.

**ASSIGNMENT OF ERROR NUMBER ONE:**

Defendant argues that his conviction was the result of "circumstantial evidence that was the product of a poor police investigation to gain a conviction, where, due to the poor police investigation, the State was unable to exclude every reasonable hypothesis of innocence."  Defendant's reasonable hypothesis of innocence is that another person, Joseph Wilkerson, killed Ms. Bazert.

In *State v. Williams*, 13-497, pp. 4-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1240, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024, this court discussed direct and circumstantial evidence in light of whether the evidence was sufficient, as follows:

> "Evidence may be either direct or circumstantial."  S*tate v. Jacobs,* 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied*, 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied,* --- U.S. ----, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012).  We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard.[2]  *State v. Williams*, 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton*, 436 So.2d 471 (La.1983)), *writ denied*, 00-99 (La.10/5/01), 798 So.2d 963.  Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances.  *Id.*  Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La.R.S. 15:438.
>
> In *State v. Chism*, 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

---

[2]When the issue of sufficiency of the evidence is raised, the inquiry of the court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 Ct. 2781 (1979).

2

Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

In the instant case, the following testimony was adduced at trial. Stephanie Williams lived across the street from Ms. Bazert. Ms. Williams spoke with Ms. Bazert outside her house in the late afternoon of January 3, 2012. She saw Ms. Bazert again around 8:30 p.m. in front of her house and did not see her again until the next afternoon, when she and the victim's father opened the door to the victim's house and saw her lying on the living room floor. There was no other evidence presented establishing that Ms. Bazert was seen alive after 8:30 p.m. on the evening of January 3rd.

There was evidence placing Defendant at the scene of the killing in that drops of the victim's blood were on one of his AirForce One tennis shoes, along with his DNA found under one of the victim's fingernails.

William Bates, a sergeant with the Alexandria Police Department, described the crime scene. He testified that the house appeared to have been searched by the killer, who, the sergeant speculated, wore gloves because of the absence of definable finger prints and bloody smears on the drawers and light switches located throughout the house. In the victim's bedroom, items were tossed about and drawers were pulled out and rifled through. Sergeant Bates discovered a footprint pressed into some clothing on the floor. From the print, he determined that the shoe was an AirForce One tennis shoe. A photograph of the shoe print was shown to the jury. The same print was found pressed into a shirt on the floor of the living room, close to the victim's body. Having been informed that Defendant was recently seen in the company of the victim, Sergeant Bates went to the home of Defendant's girlfriend, Latonya Spradley,[3] with whom he was living at the time. Because the house belonged to Ms. Spradley, Sergeant Bates obtained permission from her to search the premises and found a pair of AirForce One tennis shoes belonging to Defendant.

Ms. Spradley testified at trial that Defendant came home the evening before the victim's body was discovered covered with blood on his pullover shirt and jeans. She stated that he told her it was paint-ball dye. She did not know what became of the clothes. It was noted at trial that in her first two statements to the police, Ms. Spradley stated that Defendant did not have any blood on his clothing when he arrived home the evening of January 3rd. On February 3, 2012, she told

_____
[3]In this opinion, Defendant refers to Ms. Spradley as "Spradly."

4

the police that Defendant had called her on the evening of January 3rd and told her "they" had gotten into an altercation with the victim and that "they" had stabbed her. After he arrived home, she asked him about the blood on his clothing, and he told her it was red dye. She said that he never revealed whom he was with that night. However, at trial, Ms. Spradley stated that she did not remember him telling her that he had an altercation with the victim and that she did not tell the police he spoke of an altercation with the victim. In a statement made on April 2, 2012, Ms. Spradley told the police Defendant wrote her a letter and threatened that he would do to her what he had done to the woman over on Fifteenth Street. According to the State's exhibit at trial, the victim's house was on Fifteenth Street. She stated that she did not produce the letter because she had thrown the letter away.

Jasmine Spradley, Latonya Spradley's sister, testified she was living with her sister and Defendant at the time. She stated that when he arrived home around 2:00 a.m. (January 4th), she did not see any blood on his clothing.

Defendant produced witnesses who testified that they were with him all afternoon and until he went home at 11:00 p.m. on January 3rd. Kevin Young testified he gave Defendant a ride home around 11:00 p.m. and did not see blood on his clothes. Kenterrick Martin testified he was with Defendant during the afternoon and evening of January 3rd. Mr. Martin testified that around midnight, while they stood outside his mother's house, Joseph Wilkerson, also known as "JW," walked up to them wiping off a knife and whispered in Defendant's ear. JW bought a rock of cocaine and paid him with a twenty dollar bill. Mr. Martin stated he then walked with Defendant to the store where Defendant got a ride home. Mr. Martin testified that the next morning after he heard about the victim's death,

he examined the twenty dollar bill and saw blood on the bill. He explained he went to the store and spent the money because he did not want anything to do with it. Mr. Martin further testified that he was currently incarcerated and that he had several prior convictions for burglaries, possession of a controlled dangerous substance with intent to distribute, and theft. Devon Jordan, who also admitted he had a criminal history of violent crimes and drug convictions, testified he was with Defendant and Mr. Martin the night of January 3rd when JW approached them in the street. Mr. Jordan stated he went into a friend's house, and, when he came out, JW was gone. Defendant and Mr. Martin then left the area, heading down the street.

Joann Taylor testified that JW was living with her at the time of this incident. She stated that when she came home around 9:00 the evening of January 3rd, there were drops of blood all over her bathroom floor and in his bedroom. She stated he asked her daughter for a band-aid because he had cut his little finger. She said he also had scratches on his neck and that he was acting real "jittery." Ms. Taylor also mentioned a prior incident wherein JW had lunged at her with a broken steak knife. She testified that JW hurriedly left town three days after the victim was killed. She called the police and told them to come get the bloody comforter that was on his bed. Ms. Taylor stated that Detective Fairbanks came and got the comforter and that she never heard anything of it thereafter.

Clifton Fairbanks, a detective with the Alexandria Police Department, and Sergeant Bates both testified that they went to Ms. Taylor's house following a phone call from her that she had information regarding the death of Ms. Bazert. They testified that they did not see blood on the bedding. Ms. Taylor told them she had washed everything, including the comforter. However, they did see what

6

looked like spaghetti or barbecue sauce stains around the bed. They stated they did not take the comforter with them.

Detective Fairbanks had testified earlier that JW was a person of interest at the time of the investigation. He said that he had brought JW back from Indiana. A buccal swab was taken from JW and submitted for DNA testing. JW told the police he had given a knife to Defendant that evening. After testing, it was determined that JW's DNA was not associated with the offense.

Defendant argues that the three pieces of evidence the State relied on were inconclusive as to his guilt or participation in the murder. He suggests that the "small drop of the victim's blood" discovered on the top of his shoe was either deposited at some time when he was in the victim's company while doing an odd job for her, or when JW was wiping off the knife he stabbed the victim with when he stood with Defendant and his friends on the street corner that evening. He contends that the testimony established that the crime lab tested only two of the eight fingernail clippings from the victim's hands. He argues that had the crime lab tested for DNA from all eight of the fingernail clippings, "in a best case scenario a highly reliable DNA profile could have been identified[,]" possibly of another person.

The State produced a recorded conversation between Ms. Spradley and Defendant while he was incarcerated wherein the State asserted Defendant confessed. As to the alleged jailhouse confession, Defendant argues:

> Thirdly, there is a jailhouse recording of a conversation between James and Latanya Spradly ("Spradly"), his girlfriend, where during that conversation he says I'm guilty. In listening to the conversation, it is clear that James and Spradly are arguing or, at the very least, are argumentative. Just prior to James saying the word guilty, he is discussing the filing of motions before anything can transpire. Then, very abruptly he says, "I'm' [sic] guilty you think I like being in here,

you think I want to be here". (State Ex. 28 @ ~ 4:18). Listening to the recording there is a sense of frustration, as he feels he is being treated as if he is guilty until proven innocent; that nothing is going to change his position; and that Spradly, his girlfriend, is treating him and talking to [him] as if he is guilty.

The jury listened to the recording and also heard Defendant encourage Ms. Spradley to lie and say that she did not give the police permission to search the house, as testified to by Detective Fairbanks.

The State also produced a recorded statement Defendant gave to the police, which was also transcribed. The jury heard the recorded statement. In the statement, Defendant described the days of January 3rd and 4th. On January 3rd, he stated that he spent the day smoking crack cocaine and consuming alcohol. He described being with his friends, Kenterrick Martin and Devon Jordan, all day. He stated that about 11:00 p.m., he got a ride home with Kevin Young. He believed the last time he saw the victim was when he fixed her cable for her television before or just after Christmas.

We find the evidence was sufficient to convict Defendant of second degree murder. The jury heard both the direct and circumstantial evidence and all of the contradicting and inconsistent testimony. The fact finder is given much discretion in making determinations of credibility and sufficiency of the evidence, and appellate courts are not required to determine whether witnesses are believable or the evidence establishes guilt beyond a reasonable doubt. *State v. Mussall*, 523 So.2d 1305 (La.1988). Appellate courts are to "impinge[] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

Considering the totality of the evidence in a light most favorable to the prosecution, we find the jury's decision to convict Defendant was based on reason

and common experience from the physical evidence presented, proof of collateral facts, and the circumstances. Defendant's reasonable hypothesis of innocence was that JW was the one who stabbed the victim to death. However, there was no evidence of JW's presence in the house at the time of the murder. There was substantial evidence establishing that Defendant was in the victim's house at the time of the murder by the presence of the victim's blood on his shoes and his DNA under one of her fingernails. Furthermore, a shoe print consistent with Defendant's shoe, on which the victim's blood was found, was located in the victim's bedroom and living room under circumstances that indicated he searched though her house the night of the murder.

We find no merit in this assignment of error.

**ASSIGNMENT OF ERROR NUMBER TWO:**

Defendant further contends that the State withheld material evidence in violation of *Brady*, which undermines confidence in the verdict. The evidence allegedly withheld was Ms. Taylor's revelation to the police that the evening before the victim's body was discovered, JW left a trail of blood in her bathroom and on the comforter on his bed and that he threatened her with a knife prior to the victim's death.

At trial, Detective Fairbanks testified that on January 18, 2012, he and Sergeant Bates went to Ms. Taylor's home regarding a bloody comforter. He stated he did not include the information regarding his visit to Ms. Taylor's home in his supplemental report. However, he stated that he did take a recorded statement and that the statement was transcribed.

9

In brief to this court, the State attaches a copy of Ms. Taylor's statement taken January 18, 2012, bates stamped pages 266-85, and asserts that the statement was included with the discovery. The State argues:

> As previously stated, Appellant, through his counsel of record was provided with a complete copy of the State's file, "bates stamped" pages numbered 001-629, on September 27, 2012. A duplicate copy of the same with filed with the Ninth Judicial District Clerk of Court, under seal, on September 27, 2012. (See Exhibit 2, letter to the Clerk of Court). The State continued to provide Appellant, through his counsel of record, supplemental information and/or documents, as evidence by letters from the State to defense counsel delineating the additional information provided. (See Exhibit 3).

Thus, the record indicates that the State provided Defendant, through his counsel of record, a copy of the State's entire file, consisting of "bates stamped" pages numbered 001-629. Included in the State's file was the statement Ms. Taylor gave to Detectives Fairbanks and Howard on January 18, 2012, which included the information Defendant contends was not disclosed to him. Therefore, the alleged undisclosed information was not withheld from Defendant, and this argument of error is without merit.

## DISPOSITION

Defendant's second degree murder conviction is affirmed.

**AFFIRMED.**